1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   NALINI KUMAR, et al.,                    No.  2:23-cv-02312-DAD-AC

12              Plaintiffs,

13        v.                                  ORDER GRANTING IN PART AND
                                              DENYING IN PART DEFENDANT'S
14   NATIONWIDE MUTUAL INSURANCE              MOTION FOR SUMMARY JUDGMENT
     COMPANY,                                 AND DENYING PLAINTIFFS' MOTIONS
15                                            FOR PARTIAL SUMMARY JUDGMENT
                Defendant.
16                                            (Doc. Nos. 102, 103, 104)

17

18

19        This matter is before the court on the parties' cross-motions for summary judgment.  On

20   May 8, 2024, defendant Nationwide Mutual Insurance Company ("defendant") filed a motion for

21   summary judgment in its favor (Doc. No. 102), plaintiff Nalini Kumar ("plaintiff Kumar") filed a

22   motion for partial summary judgment in her favor (Doc. No. 103), and plaintiff Allen Singh

23   ("plaintiff Singh") filed a motion for partial summary judgment in his favor (Doc. No. 104).  The

24   pending motions were taken under submission on the papers on June 4, 2024.  (Doc. No. 110.)

25   For the reasons explained below, defendant's motion for summary judgment will be granted in

26   part and denied in part, plaintiff Kumar's motion for partial summary judgment will be denied,

27   and plaintiff Singh's motion for partial summary judgment will be denied.

28   /////

                                        1

**BACKGROUND**

This case arises from plaintiffs' allegations that defendant wrongfully denied their insurance claim following fires that damaged their home.

**A.     Factual Background[1]**

In 2018, plaintiff Kumar and her spouse plaintiff Singh purchased a property at 2009 West Willow Street in Stockton, California (the "Property").  (Doc. No. 106-2 at 22, 25.)  On July 4, 2020, fires occurred at the Property.  (PUF ¶ 1.)  The Property consisted of a 900 square foot front structure with two bedrooms and one bathroom, and a 1,200 square foot rear structure made up of a garage, bathroom, and attached deck.  (PAUF ¶ 11.)  Plaintiffs' garage, which was separate from the house, burned to the ground.  (PUF ¶ 17.)

The Property was insured by a Nationwide insurance policy (the "Policy").  (PUF ¶ 2.)  In 2018, plaintiff Kumar had sought insurance directly from defendant, filling out an online application.  (PAUF ¶ 13.)  After filling out the application, plaintiff Kumar had a telephone call with defendant's sales agent, Mark Raysor.  (PAUF ¶ 14.)  The following conversation took place between Mr. Raysor and plaintiff Kumar regarding the Property and Policy:

> Q.  Well, now I am going to review this estimate that it did with you online.  What it looks like it would cost to rebuild your home in an emergency.  I am going to confirm it here, and when you are ready to move forward, we'll go over it in a little bit more detail here, so, I am getting this to load up next here.  Have any remodel – renovations or remodeling been done to the property?
>
> A.  Yes.
>
> Q.  What type of renovations or remodeling have been done?
>
> A.  It is fully remodeled.
>
> Q.  Fully remodeled, okay.  That's nice.
>
> A.  Mm-hmm.

---

[1]  The relevant facts that follow are derived in part from the undisputed facts as stated by defendant and responded to by plaintiffs (Doc. No. 106-1 ("DUF")), the undisputed facts as stated by plaintiffs and responded to by defendant (Doc. No. 107-2 ("PUF")), and the additional undisputed facts as stated by plaintiffs and responded to by defendant (Doc. No. 109-1 ("PAUF")), as well as the declarations filed by the parties in support of their respective briefs and the exhibits referenced therein.

Q. Good deal. There we go. Okay. So it tells me how big the house is. It is 844 square feet; would that be right?

A. Yeah. I don't – I thought it was 900. Is that what it is coming up as?

[…]

Q. Okay. Foundation for the house, it says – well, it says it is a concrete slab, but I don't know. I mean, so that year of house, it is probably different, like a crawl space, I mean –

A. Is it – the house has a crawl space, the garage is on a concrete slab.

Q. Partial concrete slab, okay. But most of the house is a crawl space, then, you think, for most of the construction –

A. That garage is detached from the house, so –

Q. Oh, okay.

A. The garage is on a concrete slab, and the house is on a raised foundation.

Q. Okay. So, yeah, the house, then, is, yeah, crawl space. Okay. Got it. Okay. Not a problem. Good deal. Okay. And the number of bathrooms in the house. It was listed here, what did it do here, it's just one.

A. There's one in the house and one in the garage.

Q. So there's two bathrooms then?

A. Yes.

Q. Oh, okay. All right. Okay. So I have got two bathrooms on here then, okay.

[…]

Q. Okay. So this is going to calculate here, you know, we added one bathroom, it didn't have that; and we also, you know, needed to make it correct to the crawl space instead of concrete slab foundation, here. Let's see. Oh. Well, actually I guess it is cheaper for crawl space versus concrete slab, so it actually brought it down a little bit from 246 to 236,144. Brought it down a little bit on the reconstruction, so –

A. Okay.

Q. – for the policy purposes, it is going to round off to dwelling coverage will be 236,100 for you to cover the house.

A. Okay.

3

1    Q. Other structures will be at 23,610.

2    A. Mm-hmm.

3    Q. So we're going to let those main ones update.  What we are doing
     now, we are at the point where we are going to discuss the coverages
4    and how Nationwide is going to protect, you know, your biggest
     asset, you are purchasing your – the house, and so that's the main
5    part.  Personal property.  172,550.

6    A. Mm-hmm.

7    […]

8    Q.  All right.  Since you are, you know, providing the adequate
     protection, we are going to gather some additional information
9    specific to the home.  Basically we are just going to review that
     reconstruction.  We need a little bit more detail.

10   A. Mm-hmm.

11
     Q. Now, so first thing we want to confirm with you, is the house a
12   single-family home?

13   A. Yes.

14   Q.  Okay.  And, again, we have it as year built as 2018 – I mean,
     excuse me, 1918.  I have the style as one-story house that has a crawl
15   space foundation.  And total living square foot area, we put it as 900
     square feet.

16
     A. Mm-hmm.
17
     Q. Two bathrooms, one kitchen area.
18
     A. Mm-hmm.
19
     Q. They do have the house with central heat.
20
     A. Mm-hmm.
21
     Q.  Any attached structures, such as breezeways or wood decks or
22   anything like that?

23   A. There is a – a deck, I guess it's –

24   Q. Okay.

25   A. It is – yeah, it—it is considered a deck.

26   Q. There is a deck on the house, okay.

27   A.  Not – not on the house.  It is in between the house and the – it is
     not attached to the house.

28

4

Q. Oh, so it is a detached structure, oh, okay. Okay. Got it. So let's see. I probably just need to list that here. Let's see. No, that wouldn't be it. Now – wait. Yeah, yeah, I will have to put it here. So anyways, you know, it is covered, I mean, it is covered as a detached structure anyway. Yeah. No, I guess I wouldn't add it here.

A. Okay.

Q. Well, no, I guess I do need to add it here actually, yeah, I do. That's – yes, is it like a 10 by 10 or 20 by 20 or –

A. Yeah, that –

Q. Is it kind of small?

A. – sounds right.

Q. Kind of small, okay.

A. It is a small one, yeah.

Q. Okay.

[…]

Q. Okay. Good enough. Good enough. Okay. Okay. So I took it to a little bit more because the wood deck now, 239,900, to get it rebuilt with everything. And it is your main dwelling coverage to rebuild the house, so for coverages that we are going to go over, you will be responsible for paying the out-of-pocket deductible you choose and any damage amounts for a covered claim above the coverage limits that you selected. So 239,900 for your dwelling coverage. Other structures on the property, we'll have it at 23,990.

A. Mm-hmm.

(Doc. No. 106-2 at 26–40.) On March 2, 2020, plaintiffs were issued the Policy for a policy period of April 23, 2020 to April 23, 2021. (Doc. No. 105-1 at 527.) The Policy stated in relevant part:

The Coverage A Dwelling limit shown on your declarations page is an estimated replacement cost based on general information about your home. It is developed from models that use cost of construction materials and labor rates for like homes in the area. The actual cost to replace your home may be significantly different. Nationwide does not guarantee that this figure will represent the actual cost to replace your home. You are responsible for selecting the appropriate amount of coverage and you may obtain an appraisal or contractor estimate, at your own expense, which Nationwide will consider and accept, if reasonable. Higher coverage limits may be selected and will result in higher premiums. Nationwide has other options available to enhance your coverage of your dwelling. There are Dwelling Replacement Cost endorsements of 150% and 200% that

5

provide coverage over and above your Coverage A Dwelling limit. You can add one of these endorsements by contacting your Nationwide agent or our service center.

Please review the Coverage B - Other Structures limit on your declarations to ensure you continue to be comfortable with your coverage amount. Examples of "other structures" include, but are not limited to, detached garages, tool sheds, driveways, swimming pools, gazebos and fences. Unless you purchased increased limits for Coverage B, this coverage may reflect an amount based on 10% of your Coverage A - Dwelling limit.

(Doc. No. 105-1 at 526.) The Policy also included the following coverage information:

A. Coverage A — Dwelling

1. We cover:

a. The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and

b. Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling or other structures on the "residence premises."

2. We do not cover land, including land on which the dwelling is located, or the replacement, rebuilding, restoration, stabilization or value of such land.

B. Coverage B — Other Structures

1. We cover other structures on the "residence premises" set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

(Doc. No. 105-1 at 537.) The Policy also included the following conditions:

SECTION I – CONDITIONS
. . .

C. Duties After Loss

In case of a loss to covered property, we have no duty to provide coverage under this policy if you or an "insured" seeking coverage fails to comply with the following duties:
. . .

5. Cooperate with us in the investigation of a claim;

6. Prepare an inventory of damaged personal property showing the quantity, description, "actual cash value" and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

6

1

7. As often as we reasonably require:

2

a. Show the damaged property;

3

b. Provide us with records and documents we request and permit us to make copies;

4

5

c. Make statements to us, including recorded interviews;

6

d. Submit to examination under oath by our representatives and sign same.  Upon request, the exams will be conducted separately and not in the presence of any other persons except the legal representative of the person submitting to the examination under oath, our representatives and a court reporter[.]

7

8

9

(DUF ¶ 1.)  The Policy further provided that plaintiffs had no coverage if they "[c]oncealed or

10

misrepresented any material fact or circumstance" or "[c]ommitted any fraud or made false

11

statements relating to such loss."  (DUF ¶ 2.)

12

On July 5, 2020, plaintiffs submitted a claim on the Policy to defendant.  (Doc. No. 102-1

13

at 9.)  On July 13, 2020, plaintiff Kumar gave a recorded statement to defendant in which she

14

answered questions about family finances, the mortgage and monthly payments, the purchase

15

price of the home, third party financial interests in the Property, other insurers, prior claims,

16

repairs to the home, employment and pay, the fact that plaintiff Singh (a tow truck driver) had

17

been laid off that month due to the pandemic, sources of income, monthly bills, car payments, the

18

ages of her children, how they used the garage, cars stored there, other vehicles, whether business

19

was being run out of the garage, whether anyone was living in or paying rent for the garage, the

20

sale of a car weeks before the fire, and the circumstances the night of the fire.  (PUF ¶¶ 21, 22.)

21

On July 14, 2020, plaintiff Kumar gave an additional recorded statement to defendant.  (PUF

22

¶ 21.)  On July 24, 2020, defendant referred plaintiffs' claim to its Special Investigations Unit

23

/////

24

/////

25

/////

26

/////

27

/////

28

/////

1    ("SIU").  (DUF ¶ 5.)  Defendant also submitted plaintiffs' claim to the California Department of

2    Insurance ("DOI").[2]  (DUF ¶ 8.)

3            In August 2020, plaintiffs provided defendant with a list of personal property they claimed

4    was damaged or destroyed in the fires with estimated replacement costs for the items (the

5    "Inventory List").  (DUF ¶ 4; PUF ¶ 16.)  Plaintiffs claimed the total replacement cost of their

6    personal property was $112,567.69, including approximately $37,000 of tools and equipment.

7    (DUF ¶ 4.)  On September 9, 2020, plaintiffs gave a recorded statement to defendant in which

8    they answered questions about the Inventory List and family finances.  (PUF ¶¶ 21, 24, 25, 26.)

9    On October 22, 2020, defendant's adjuster Shawn Dalton inspected the Property with plaintiffs

10   and located evidence of many items on the Inventory List but was unable to identify two large

11   Snap-On brand toolboxes.[3]  (Doc. No. 106-2 at 17.)  During this inspection, Mr. Dalton took

12   photographs of the debris.  (Doc. No. 102-3 at 88–101.)  Mr. Dalton later recorded that plaintiff

13   Singh identified to him where the toolboxes had been located amongst the debris, agreed that the

14   toolboxes were no longer there, and advised that it appeared that they had been taken.  (Doc. No.

15   106-2 at 18.)  Defendant's SIU investigator tried unsuccessfully to verify with Snap-On

16   /////

17   /////

_____

18   [2]  Companies licensed to write insurance in California are required to submit a claim to the state
19   DOI within sixty days of determining that a claim appears to be fraudulent.  (Doc. No. 102-3 at
     79.)  The parties dispute defendant's reason for referring and submitting plaintiffs' claim to the
20   SIU and DOI.  Defendant notes that the comment section of the Suspected Fraudulent Claim
     Referral Form indicated that the claim was referred due to "Negative financials, Mr. member
21   recently unemployed, reports from neighbors that vehicles were moved out of the garage a few
     days prior to the fire, 2 separate areas of origin in 2 separate buildings, prior theft claim 1 year
22   prior, members were not home at the time of the fire."  (Doc. No. 102-3 at 86.)  Plaintiffs identify
     deposition testimony which they purport demonstrated that these comments on the referral form
23   were "perjured."  (DUF ¶ 5.)  Plaintiffs have also submitted evidence to the court on summary
     judgment suggesting that the fire department determined that the fires were caused by fireworks,
24   not by arson.  (Doc. No. 105-1 at 130.)  However, the parties do agree that the claim was referred
     to SIU and submitted to the state DOI, (DUF ¶ 5), and the court does not find the reason for those
25   actions or the cause of the fires to be material to resolution of the pending motions.

26

27   [3]  The Inventory List described one Snap-On brand toolbox as containing ten drawers and costing
     approximately $5,705 to replace, and the other as containing eight drawers and costing
28   approximately $10,255 to replace.  (Doc. No. 102-3 at 72.)

1   representatives whether Plaintiffs ever purchased Snap-On tools or toolchests.[4]  (DUF ¶ 7.)

2   Defendant's claims associate noted that he went over his contacts with Snap-On tools and "no one

3   from their Stockton, CA area reps have any information re sales to Alan [sic] Singh."  (Doc. No.

4   102-3 at 81.)

5          On December 31, 2020, defendant's attorney sent plaintiffs a letter demanding that they

6   each submit to an examination under oath ("EUO").  (PUF ¶ 55.)  On February 25, 2021, plaintiff

7   Singh appeared for his EUO (the "2021 EUO"), and sought to videotape the examination,

8   including all participants.  (PUF ¶ 57.)  Defendant's attorney stated that the 2021 EUO would not

9   proceed if plaintiff Singh was going to video record all participants.  (PUF ¶ 57.)  No EUO took

10  place that day.  (Doc. No. 102-3 at 108.)

11         On April 14, 2021, defendant denied plaintiffs' claims.  (PUF ¶ 60.)  Plaintiffs, through

12  their counsel, then sued defendant in Marin County Superior Court to clarify their rights under

13  California law to videotape all participants in an EUO.  (PUF ¶ 60; DUF ¶ 11.)  Defendant

14  removed the case to the Northern District of California, where it was assigned to Magistrate

15  Judge Thomas S. Hixson.  (DUF ¶ 11.)  At a hearing in December 2021, Judge Hixson announced

16  his intent to rule in defendant's favor on the video recording issue.  (DUF ¶ 13.)  Immediately

17  thereafter, plaintiffs dismissed their case before that court without prejudice.  (DUF ¶ 13.)

18         On January 14, 2022, defendant's attorney sent plaintiffs a letter stating that, given

19  plaintiffs' abandonment of their position that EUOs be video recorded, defendant would agree to

20  withdraw its April 14, 2021 denial of plaintiffs' claim and would attempt to complete its

21  investigation and evaluation of the claim.  (Doc. No. 106-2 at 4.)  Defendant conducted plaintiff

22  Singh's EUO on June 21 and June 22, 2022 (the "2022 EUO").  (PUF ¶ 66.)  At the 2022 EUO,

23  defendant's counsel questioned plaintiff Singh about the Snap-On 55-inch, 10-drawer double

24  bank roll cab.  (DUF ¶ 14.)  Plaintiff Singh stated that it was in the garage at the time of the fires

25  and that he "believe[d] he got it from Craigslist" but did not remember the name of the person

26  _____

27  [4]  Plaintiffs state that this fact is disputed because defendant's "citations do not refer to pages in
    its motion."  (DUF ¶ 7.)  The court observes that defendant has indeed identified the evidence that
    supports this fact and finds that plaintiffs have not raised or established the existence of a genuine
28  dispute as to this fact.  *See* Doc. No. 102-3 at 79–80.

who sold it to him.  (DUF ¶ 14.)  Plaintiff Singh stated that it was heavy enough that it took

"[f]our people to unload it" from the truck that brought it to his house.  (DUF ¶ 14.)  When asked

for the names of the friends who helped him load the chest, Mr. Singh provided the name "Timoti

Timoti."  (PUF ¶ 80.)  Defendant's lawyer then asked for Mr. Timoti's phone number.  (PUF

¶ 81.)  The following exchange occurred:

> Q.  Okay.  And what is this gentleman's telephone number?
>
> MR. SCHAFFER:  So, Mr. Pardini, I think the way we will handle
> it, because of this privacy issue, is if you'd like to give me the names
> of anyone, whether previously disclosed or disclosed today or by Ms.
> Kumar as related to the friends or family, I will act as intermediary
> and represent them and make an inquiry to them as to whether they
> want to provide information or be interviewed by Nationwide.
>
> MR. PARDINI:  Okay.  So you want me to give you a list of people
> that you can contact and tell them that Nationwide wants to talk to
> them about a certain set of facts, and then get their permission for
> Nationwide to contact them?
>
> MR. SCHAFFER:  Not exactly.  So the question you are asking is
> private and personal information for noninsureds.  So Mr. Singh and
> Ms. Kumar would be very much within their rights to say, no, I'm
> not giving you that information.  So as a starting point, that is, I
> believe, our position, that you are not entitled to ask insureds for
> private personal information for third parties not insured.

(DUF ¶ 15.)  Plaintiffs' counsel then stated that "if they [the third parties] want to have a

conversation with you, I will set it up and I will represent them."  Otherwise, plaintiffs' counsel

objected on the grounds that defendant was not entitled to ask plaintiffs for "lots of personal

information about their friends and family" because it was "an invasion of their privacy" and "an

intrusion, unnecessary intrusion."  (DUF ¶ 16.)  Plaintiff Singh then gave the names "Ray

Araozezte" and "Mike," full name "Michael Moore" as the other two people involved in the

pickup and delivery of the tool chest.  (DUF ¶ 17.)  Plaintiff Singh stated that he paid for the tool

chest in cash and did not get a receipt.  (DUF ¶ 17.)

Defendant's counsel also asked plaintiff Singh about the other Snap-On toolbox appearing

on plaintiffs' Inventory List.  (DUF ¶ 18.)  Plaintiff Singh testified that his friend Mr. Timoti was

with him when he bought it on Craigslist.  (DUF ¶ 18.)  The following exchange occurred, at the

2022 EUO, regarding the second Snap-On toolbox:

1    Q. First of all, do you recall how much you paid for this item?

2    A. Roughly?

3    Q. Sure.

4    A. Yes, I do.

5    Q. Okay. How much?

6    A. About – close to about eight grand.

7    MR. SCHAFFER: It's on the...

8    MR. PARDINI: Okay, Mr. Schaffer, are you whispering to your
     client?

9
     MR. SCHAFFER: No, I am pointing him to the fact that he had got
10   all the information on this inventory that he prepared.

11   MR. PARDINI: So you are whispering to your client?

12   MR. SCHAFFER: No, I am not whispering. I am telling him on the
     record, Mr. Pardini, that all of the information you are asking about
13   the insured spent an immense amount of time putting onto a
     document so that they would be able to answer these questions
14   intelligently.

15   (DUF ¶ 23.) Plaintiffs' counsel also told plaintiff Singh at the 2022 EUO to "look at the work

16   you have done" to answer the questions and stated that he could and should "assist [his] client,

17   when it's appropriate, to look at the work he has done to ensure that his responses are consistent

18   with two recorded statements" and various other documentation previously provided to

19   Nationwide. (DUF ¶ 24.)

20       At the 2022 EUO, defendant's counsel also asked plaintiff Singh a question about the "fire

21   that occurred" and plaintiffs' counsel interjected that the question "misstates the evidence" and

22   that "[t]here were actually two fires." (DUF ¶ 25.) When defendant's counsel asked when

23   plaintiff Singh was laid off from his last job, plaintiffs' counsel asked "Before or after COVID?"

24   (DUF ¶ 26.) Plaintiff Singh then responded, "It was right when COVID like – when COVID

25   started, around that time." (DUF ¶ 26.) Defendant's counsel objected to plaintiffs' counsel's

26   interjection, and plaintiffs' counsel responded that his role was "to assist Mr. Singh to obtain the

27   policy benefits he is entitled to," and that "to the extent I can assist my client to refresh his

28   recollection and so forth, I think it is absolutely appropriate." (DUF ¶ 26.) Plaintiffs' counsel

1   stated that when defendant's counsel "ask[s] a question that I know the answer to and I – Mr.

2   Singh and I have discussed this, and I know the history to refresh his recollection to testify

3   truthfully, that is not coaching." (DUF ¶ 26.)

4        Defendant suspended the remainder of the 2022 EUO and did not proceed with plaintiff

5   Kumar's EUO because there was "a fundamental disagreement with [Plaintiffs' counsel] as to

6   what his involvement is in this process" and that "given the circumstances there is no reason or

7   need to try to conduct [Ms. Kumar's] examination either until this fundamental disagreement is

8   resolved." (DUF ¶ 27.)

9        On June 27, 2022, defendant sought the following additional information:  (a) receipts for

10  Inventory List items, (b) photos showing Inventory List items, (c) addresses of the two toolbox

11  sellers, and (d) contact information for Mr. Timoti, Ray Arazete, and Michael Moore, the

12  individuals plaintiff Singh had identified as having helped him with his receiving the toolboxes.

13  (PUF ¶ 114.)

14       On June 29, 2022, plaintiffs informed defendant that they had provided all responsive

15  receipt documents and photographs.  (PUF ¶ 115.)  Plaintiff Singh told defendant that he could

16  not identify the addresses of the two toolbox sellers.  (PUF ¶ 116.)  Plaintiffs also told defendant

17  that Mr. Timoti wishes to be contacted via Facebook, Mr. Arazete is dead, and they were unable

18  to reach Mr. Moore.  (PUF ¶ 117.)  Plaintiffs' counsel told defendant's counsel that "Mr. Timoti

19  Timoti has no phone number; he wishes to be contacted via Facebook; in light of privacy

20  concerns, at Mr. Timoti's request, your insureds decline to provide an address for Mr. Timoti."

21  (DUF ¶ 19.)  Plaintiffs' counsel also changed the position he had taken earlier, and stated he

22  would "withdraw [his] offer to contact these witnesses to assist Nationwide to obtain their

23  statements."  (DUF ¶ 29.)  Plaintiffs also filed this lawsuit in the Northern District of California

24  that same day, before defendant took any further action on plaintiffs' claim.  (DUF ¶ 29.)

25       Defendant responded on July 5, 2022 that plaintiff's proposal that the defense contact Mr.

26  Timoti only by way of Facebook was not appropriate and requested Timoti's telephone number

27  (or a number where he could be reached, if he did not have one) or to set up an in-person meeting

28  at a time and place convenient for him.  (DUF ¶ 20.)  After further follow-up requests, plaintiffs'

1    counsel wrote defendant's counsel on August 7, 2022 informing them that "Insureds have no

2    further response" to defendant's request regarding Mr. Timoti.  (DUF ¶ 21.)

3           Defendant denied plaintiffs' claim in a letter dated September 1, 2022.  (DUF ¶ 29.)

4    According to defendant, because the denial was based on plaintiffs' lack of cooperation,

5    defendant never completed its investigation and never determined whether fraud occurred in

6    connection with plaintiffs' claim.  (DUF ¶¶ 28, 29; Doc. No. 102-3 at ¶ 8.)  To date, other than

7    housing benefits paid in 2020 and early 2021, and a $2,500 advance for contents paid in July

8    2020, defendant has paid no benefits for the repair of the Property or to replace plaintiffs'

9    personal property.  (PAUF ¶ 8.)

10          This case was transferred to the Eastern District on October 12, 2023.  (Doc. No. 78.)  On

11    October 24, 2023, defendant served a subpoena on Mr. Timoti requiring his appearance at a

12    deposition noticed for November 27, 2023.  (Doc. No. 93-1 at 9, 12.)  After Mr. Timoti did not

13    appear at the deposition, defendant filed a motion to compel Mr. Timoti's compliance with the

14    deposition subpoena, which the assigned magistrate judge granted.  (Doc. No. 97.)  On February

15    26, 2024, the deposition of Mr. Timoti was conducted.  (Doc. No. 105-1 at 895.)  Mr. Timoti

16    testified that he had helped plaintiff Singh move a Matco brand toolbox one time and that he did

17    not know where plaintiff Singh bought the toolbox.  (DUF ¶ 32.)  Mr. Timoti also testified that he

18    "always" has a cell phone and has had the same phone number for "a while."  (DUF ¶ 30.)  He

19    also testified that when communicating with plaintiff Singh "[h]e calls me most of the time or I

20    call him . . . on a telephone" and that after the fires, Mr. Timoti called plaintiff Singh.  (DUF

21    ¶ 30.)  At his deposition, Mr. Timoti also testified that when plaintiff Singh asked him if

22    defendant could contact him, he responded by saying that defendant should contact him by way

23    of Facebook Messenger.  (Doc. No. 105-1 at 896.)

24    /////

25    /////

26    /////

27    /////

28    /////

1    **B.    Procedural Background**

2        As stated above, plaintiffs filed their operative complaint on June 29, 2022.[5]  (Doc. No. 1.)

3    This action proceeds on the following four claims asserted in the complaint:  (1) breach of

4    contract; (2) breach of the covenant of good faith and fair dealing[6]; (3) negligent failure to obtain

5    insurance coverage; and (4) negligent misrepresentation.  (*Id*. at ¶¶ 83–112.)

6        On May 8, 2024, defendant filed its pending motion seeking summary judgment in its

7    favor as to all of plaintiffs' claims.  (Doc. No. 102.)  The same day, plaintiff Kumar filed her

8    pending motion for partial summary judgment in her favor as to three of defendant's affirmative

9    defenses (Doc. No. 103), and plaintiff Singh filed his pending motion for partial summary

10   judgment in his favor as to four of defendant's affirmative defenses (Doc. No. 104).  On May 21,

11   2024, plaintiffs filed a joint opposition to defendant's motion for summary judgment.  (Doc. No.

12   106.)  On May 22, 2024, defendant filed an opposition to both of plaintiffs' motions for partial

13   summary judgment.  (Doc. No. 107.)  On June 3, 2024, plaintiffs and defendant filed reply briefs.

14   (Doc. Nos. 108, 109.)

**LEGAL STANDARD**

16       Summary judgment is appropriate when the moving party "shows that there is no genuine

17   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

18   Civ. P. 56(a).

19       In summary judgment practice, the moving party "initially bears the burden of proving the

20   absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

---

22   [5]  As noted above, plaintiffs filed their complaint in the Northern District of California.  (Doc. No.
23   1.)  On March 28, 2023, defendant filed a motion for summary judgment in its favor before the
     previously assigned district judge in the Northern District.  (Doc. No. 32.)  On May 1, 2023,
     plaintiffs filed motions for partial summary judgment in their favor in the Northern District.
24   (Doc. Nos. 41, 42.)  On October 12, 2023, venue was found to be improper in the Northern
     District of California, this action was transferred to the Eastern District of California, and the
25   parties' motions for summary judgment were denied as moot in light of the transfer order.  (Doc.
26   No. 77.)  The same day, the case was transferred into the Eastern District of California and
     assigned to the undersigned.  (Doc. Nos. 78, 79.)

27
28   [6]  This claim is characterized as one for "insurance bad faith" in plaintiffs' complaint.  (Doc. No.
     1 at 14.)

1   (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party

2   may accomplish this by "citing to particular parts of materials in the record, including

3   depositions, documents, electronically stored information, affidavits or declarations, stipulations

4   (including those made for purposes of the motion only), admissions, interrogatory answers, or

5   other materials," or by showing that such materials "do not establish the absence or presence of a

6   genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

7   Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at trial,

8   "the moving party need only prove that there is an absence of evidence to support the non-moving

9   party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R.

10  Civ. P. 56(c)(1)(B).  Indeed, after adequate time for discovery and upon motion, summary

11  judgment should be entered against a party who fails to make a showing sufficient to establish the

12  existence of an element essential to that party's case, and on which that party will bear the burden

13  of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an

14  essential element of the nonmoving party's case necessarily renders all other facts immaterial."

15  *Id.* at 322–23.  In such a circumstance, summary judgment should be granted, "so long as

16  whatever is before the district court demonstrates that the standard for the entry of summary

17  judgment . . . is satisfied."  *Id.* at 323.

18      If the moving party meets its initial responsibility, the burden then shifts to the opposing

19  party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita*

20  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the

21  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

22  of its pleadings but is required to tender evidence of specific facts in the form of affidavits or

23  admissible discovery material in support of its contention that the dispute exists.  *See* Fed. R. Civ.

24  P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773

25  (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for

26  summary judgment.").  The opposing party must demonstrate that the fact in contention is

27  material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the

28  /////

1  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

2  non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986).

3      In the endeavor to establish the existence of a factual dispute, the opposing party need not

4  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

5  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

6  trial."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

7  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in

8  order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (citations

9  omitted).

10      "In evaluating the evidence to determine whether there is a genuine issue of fact," the

11  court draws "all inferences supported by the evidence in favor of the non-moving party."  *Walls v.*

12  *Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's

13  obligation to produce a factual predicate from which the inference may be drawn.  *See Richards*

14  *v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th

15  Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

16  simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record

17  taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

18  'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 586–87 (citations omitted).

## ANALYSIS

20      The court will first consider whether defendant is entitled to summary judgment in its

21  favor as to plaintiffs' claims, and then will address plaintiffs' cross-motions for summary

22  judgment aimed at defendant's affirmative defenses.

23  **A.      Defendant's Motion for Summary Judgment**

24      Defendant first moves for summary judgment in its favor on all four of plaintiffs' claims

25  due to plaintiffs' purported failure to cooperate with defendant's investigation process.  (Doc. No.

26  102-1 at 18–27.)  Defendant argues that because of plaintiffs' noncooperation, there is no genuine

27  dispute that its denial of insurance coverage was proper, which precludes liability under any of

28  the theories plaintiffs pursue in their complaint.  (*Id*. at 24.)  Defendant also argues that, in the

1    alternative, the court should at least grant partial summary judgment in its favor as to plaintiffs'

2    bad faith, punitive damages, and negligence claims.  (*Id*. at 27–31.)

3            1.      Plaintiffs' Failure to Cooperate

4            As noted above, the Policy provides that defendant has "no duty to provide coverage" if

5    an insured "seeking coverage fails to comply" with the duties to "cooperate . . . in the

6    investigation of a claim," "prepare an inventory of damaged personal property" and "attach all

7    bills, receipts and related documents that justify the figures in the inventory," "show the damaged

8    property," provide "records and documents," "make statements," and "submit to examination

9    under oath."  (DUF ¶ 1.)  Defendant argues that plaintiffs' failure to provide Mr. Timoti's contact

10   information and plaintiffs' counsel's conduct at the 2022 EUO amount to noncooperation, in

11   violation of plaintiffs' duties under the Policy.  (Doc. No. 102-1 at 18–24.)  In opposition,

12   plaintiffs argue that defendant has not carried its burden to show a breach of the Policy and

13   substantial prejudice as a result of any such breach, as required.  (Doc. No. 106 at 10.)  In reply,

14   defendant argues that because plaintiffs' noncooperation "prevented it from contacting witnesses

15   in a meaningful way, making it difficult if not impossible to determine whether Plaintiffs' claim

16   was valid," it was "thereby prejudiced."  (Doc. No. 109 at 7.)

17           Standard insurance policy terms in California require that "the insured, as often as may be

18   reasonably required . . ., shall produce for examinations all books of account, bills, invoices and

19   other vouchers, or certified copies thereof if the originals be lost, at any reasonable time and place

20   as may be designated by this company or its representative, and shall permit extracts and copies

21   thereof to be made."  Cal. Ins. Code § 2017(a).  California courts have upheld the validity of

22   these cooperation clauses in the context of providing information to the insurer during the

23   investigation of a claim.  *Belz v. Clarendon America Inc. Co*., 158 Cal. App. 4th 615, 626 (2007).

24   "When an insured fail[s] to comply with the insurance policy provisions requiring an examination

25   under oath and the production of documents, the breach generally results in a forfeiture of

26   coverage, thereby relieving the insurer of its liability to pay and provides the insurer an absolute

27   defense to an action on the policy."  *Brizuela v. CalFarm Ins*., 116 Cal. App. 4th 578, 590 (2004).

28   "Generally, a determination as to whether an insured breached his duty to cooperate and whether

                                            17

an insurer was prejudiced by that breach are questions of fact." *Ram v. Infinity Select Ins*., 807 F. Supp. 2d 843, 857 (N.D. Cal. 2011). However, if the facts of the case are "uniformly unfavorable" to one party, breach of the duty to cooperate may be determined as a matter of law. *Martinez v. Infinity Ins. Co*., 714 F. Supp. 2d 1057, 1062 (C.D. Cal. 2010). If a court finds as a matter of law that the insured has breached his duty to cooperate and the insurer was prejudiced by that breach, the insurer is entitled to summary judgment on the insured's breach of contract claim. *See, e.g., Abdelhamid v. Fire Ins. Exch.*, 182 Cal. App. 4th 990, 1002, 1007 (2010); *Martinez*, 714 F. Supp. 2d at 1063. "No prejudice needs to be shown when an insured fails to submit to an EUO." *Nissani v. Jewelers Mut. Ins. Grp*., No. 2:22-cv-00880-MCS-JPR, 2022 WL 3013225, at *2 (C.D. Cal. July 13, 2022) (citing *Brizuela*, 116 Cal. App. 4th at 590–91 (holding that "an insured's failure to comply with the policy requirement for examination under oath deprives the insurer of a means for obtaining information necessary to process the claim" and "the inability to obtain such information is prejudicial")). However, "in the context of cooperation that does not involve submission to an under oath examination, California courts have required a showing that the insurer was prejudiced in its investigation by the insured's failure to cooperate in order to void the policy." *Ram*, 807 F. Supp. 2d at 857.

Here, defendant argues that plaintiffs failed to cooperate under the Policy by not providing appropriate contact information for Mr. Timoti, and separately, through counsel's conduct at the 2022 EUO.

   a.    *Contact Information for Mr. Timoti*

As to Mr. Timoti's contact information, the evidence submitted to the court on summary judgment suggests that plaintiffs told defendant to contact Mr. Timoti regarding the toolboxes they claimed had been damaged or destroyed in the fires via Facebook rather than providing his phone number or helping arrange an in-person meeting with him. While the court certainly understands defendant's frustration, defendant has not demonstrated that this response amounts to prejudicial noncooperation as a matter of law. As stated, the Policy provides that insureds have duties to "cooperate . . . in the investigation of a claim," "prepare an inventory of damaged personal property" and "attach all bills, receipts and related documents that justify the figures in

18

the inventory," "show the damaged property," provide "records and documents," "make statements," and "submit to examination under oath." (DUF ¶ 1.) The Policy does not state that defendant has no duty to provide coverage if the insured does not provide contact information in the format requested by defendant, and defendant has offered no authority indicating that the Policy could be read that way. *Cf. Anderson v. Allianz Life Ins. Co. of N. Am.*, No. 1:22-cv-00165-KES-EPG, 2024 WL 2257689, at *5 (E.D. Cal. May 17, 2024) ("The issue is not whether the insurer has received every item of information that it has requested or has in its hands the exact type of information that it prefers when deciding a claim, rather the question is whether there was enough evidence of whatever form and however acquired that the insurer would act unreasonably if it refused to pay the claim.")

Further, the evidence submitted to the court on summary judgment suggests that plaintiffs did provide defendant with hundreds of pages of responsive documents, created an Inventory List, gave recorded statements, attended joint visits of the Property, and attended the 2022 EUO. There is also evidence that as part of defendant's investigation of plaintiffs' claim, adjuster Shawn Dalton visited the Property and dug through the debris with plaintiff Singh. (Doc. No. 106-2 at 18.) As noted above, Mr. Dalton was unable to locate the remains of the two toolboxes, and took photographs indicating that there was no sign of them. (Doc. No. 102-3 at 88–101). Mr. Dalton later noted that during this inspection, plaintiff Singh identified where the toolboxes had previously been located, agreed that they were no longer there, and advised that it appeared that they were stolen from the Property after the fires. (Doc. No. 106-2 at 18.) Within this degree of cooperation and communication with plaintiffs, it is fair to say that defendant was certainly able to develop at least some amount of evidence bearing on the legitimacy of plaintiffs' claims. The court is therefore unable to determine as a matter of law that defendant was substantially prejudiced by plaintiffs' response regarding contact information for a witness who could provide additional information about two toolboxes that were claimed to have been destroyed in the fires.[7]

_____

[7] The court also notes that defendant ultimately was able to depose Mr. Timoti and asked him for additional information about the toolboxes, although that deposition took place in the course of this litigation and well after defendant's operative denial of plaintiffs' claim.

1  *See OEM Pac., Inc. v. Liberty Mut. Ins. Co.*, No. 2:17-cv-02143-SJO-AJW, 2018 WL 3357487, at

2  *1 (C.D. Cal. June 22, 2018) (explaining that "not every failure by an insured to cooperate should

3  result in a forfeiture of policy benefits" because "a jury may conclude that the failure to

4  comply . . . was serious or trivial").

5       Accordingly, the court finds that there is at the very least a disputed question of material

6  fact as to both whether plaintiffs' response regarding Mr. Timoti's contact information was

7  uncooperative, and if so, whether defendant was substantially prejudiced by plaintiffs' response.

8  The court will therefore deny defendant's motion for summary judgment in its favor on all of

9  plaintiffs' claims as predicated on plaintiffs' purported lack of cooperation regarding Mr.

10  Timoti's contact information.

11            b.  *Interference During the 2022 EUO*

12       Next, defendant argues that plaintiffs' noncooperation is evidenced by their counsel's

13  interference with plaintiff Singh's 2022 EUO.  Defendant essentially argues that, because of

14  plaintiffs' counsel's coaching during the 2022 EUO, wherein counsel interjected at times and

15  pointed plaintiff Singh to a particular document or answer, defendant "did not get Mr. Singh's

16  testimony," and thus that "Mr. Singh did not 'submit' to an EUO" as required under the Policy.

17  (Doc. No. 102-1 at 23.)  However, once again, defendant cites no authority, and the court can find

18  none, suggesting that this Policy condition must be read so broadly that instances of an insured's

19  counsel interfering with an EUO in this manner would amount to noncooperation with an EUO

20  requirement as a matter of law.  Existing authority instead suggests, as noted previously, that

21  courts generally find non-cooperation when an insured refuses to submit to an EUO entirely.

22  *Brizuela*, 116 Cal. App. 4th at 597 ("Brizuela's persistent failure to provide CalFarm with

23  available dates for the examination under oath evidences a pattern of noncooperation. . . .  The

24  trial court properly dismissed Brizuela's action."); *Martinez*, 714 F. Supp. 2d at 1063 (finding no

25  genuine issue of material fact as to whether the plaintiff breached the cooperation clause where

26  the plaintiff "failed to produce financial documents, car payment records, and maintenance

27  records, and failed to timely produce herself for an under oath examination").  However, when a

28  plaintiff has participated in an EUO or complied with the EUO requirement to a significant

1    degree, courts have generally found that the insurer is not entitled to summary judgment in its

2    favor on the basis of the insured's claimed noncooperation.  *See Walker v. Fin. Indem. Co*., No.

3    14-cv-03161-EMC, 2015 WL 3542693, at *2 (N.D. Cal. June 5, 2015) (denying the defendant's

4    motion for summary judgment where the plaintiff "sat for an examination under oath and

5    answered a substantial number of [the defendant's] questions" but refused to answer questions

6    about his financial condition because his counsel instructed him not to for privacy reasons);

7    *Henney v. State Farm Gen. Ins. Co*., No. 2:21-cv-01452-SPG-KS, 2023 WL 3564933, at *5 (C.D.

8    Cal. Apr. 21, 2023) (finding a "genuine dispute regarding whether it was reasonable for [the

9    d]efendant to deny [the p]laintiff's claim for failure to cooperate with [the d]efendant's

10   investigation" where the plaintiff sat for a first EUO for over six hours but declined to sit for a

11   second EUO); *Fay Ave. Properties, LLC v. Travelers Prop. Cas. Co. of Am.*, No. 11-cv-02389-

12   GPC-WVG, 2014 WL 4854684, at *11 (S.D. Cal. Sept. 23, 2014) ("The Court concludes that

13   there are genuine issues of material fact whether it was reasonable for [the p]laintiff to refuse to

14   attend the fifth EUO . . . .").

15        Here, plaintiff Singh attended his 2022 EUO for over three hours on June 21, 2022 and for

16   approximately another eighty minutes on June 22, 2022.  (Doc. No. 105-1 at 57, 176, 211, 246.)

17   In these sessions, plaintiff Singh answered numerous questions regarding the fires, the Property,

18   his employment, his insurance application, his family's financial situation, and his possessions

19   including the purportedly destroyed toolboxes in question.  (*Id*. at 55–262.)  While evidence

20   submitted to the court on summary judgment suggests that a few of plaintiff Singh's answers to

21   those questions were guided by his counsel, plaintiff Singh's participation in the 2022 EUO

22   appears much more in line with the situation addressed by the district court in *Walker*, where the

23   plaintiff attended an EUO but refused to answer questions that his counsel instructed him not to,

24   than the type of situation addressed by the courts in *Brizuela* or *Martinez*, where the plaintiffs

25   failed to appear for the EUOs at all.  Accordingly, the court does not find sufficient support for

26   defendant's argument that plaintiff Singh's 2022 EUO establishes that as a matter of law he failed

27   to "submit" to an EUO or demonstrated prejudicial noncooperation with the Policy's conditions.

28   There is again, at the very least, a disputed question of material fact as to both whether plaintiff

1    Singh was cooperative during the 2022 EUO in compliance with the terms of the Policy, and if

2    not, whether defendant's ability to investigate was substantially prejudiced as a result.  This is the

3    case in light of the answers that defendant did receive and the information that defendant had

4    available to it to process plaintiffs' claim.

5         Therefore, defendant's motion for summary judgment in its favor on all of plaintiffs'

6    claims as predicated on the purported lack of cooperation during the 2022 EUO will be denied as

7    well.

8         2.    <u>Plaintiffs' Bad Faith Claim</u>

9         Defendant also moves for summary judgment in its favor on plaintiffs' second claim for

10   "insurance bad faith," or breach of the covenant of good faith and fair dealing.  (Doc. No. 102-1

11   at 27–29.)  Defendant argues that because its "decision to refuse to afford coverage to an insured

12   who, through their counsel, chose to interfere with a claim investigation . . . was reasonable as a

13   matter of law[,]" plaintiffs cannot maintain a claim for breach of the covenant of good faith and

14   fair dealing.  (*Id*. at 28.)  In opposition, plaintiffs argue that defendant does not come close to

15   demonstrating that it is indisputable that its denial of plaintiffs' insurance claim was reasonable.

16   (Doc. No. 106 at 21–22.)

17        California has a well-established cause of action sounding in tort, rather than contract,

18   against an insurer who breaches the implied covenant of good faith and fair dealing with its

19   insured, when it "unreasonably and in bad faith withholds payment of the claim of its insured."

20   *Foley v. Interactive Data Corp*., 47 Cal. 3d 654, 683–85 (1988) (en banc).  For an insurer to

21   fulfill its obligations, it "must give at least as much consideration to the latter's interests as it does

22   to its own."  *Egan v. Mut. of Omaha Ins. Co*., 24 Cal. 3d 809, 818–19 (1979).  "While an

23   insurance company has no obligation under the implied covenant of good faith and fair dealing to

24   pay every claim its insured makes, the insurer cannot deny the claim 'without fully investigating

25   the grounds for its denial.'"  *Wilson v. 21st Century Ins. Co*., 42 Cal. 4th 713, 720–21 (2007)

26   (quoting *Frommoethelydo v. Fire Ins. Exch*., 42 Cal. 3d 208, 215 (1986)).  "Among the most

27   critical factors bearing on the insurer's good faith is the adequacy of its investigation of the

28   claim."  *Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 879–80

(2000), *as modified on denial of reh'g* (Mar. 29, 2000).  The ultimate question in considering a

bad faith claim is "whether the refusal to pay policy benefits was unreasonable." *Ospal v. United*

*Servs. Auto. Ass'n*, 2 Cal. App. 4th 1197, 1205 (1991); *Chateau Chamberay Homeowners Ass'n*

*v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 347 (2001) ("[B]efore an insurer can be found

to have acted tortiously (i.e., in bad faith), for its delay or denial in the payment of policy benefits,

it must be shown that the insurer acted unreasonably or without proper cause.") (emphasis added).

Breaches of the implied covenant of good faith and fair dealing in the insurance context

are subject to the "genuine dispute rule."  As explained by the California Supreme Court:

> [A]n insurer's denial of or delay in paying benefits gives rise to tort damages only if the insured shows the denial or delay was unreasonable.  As a close corollary of that principle, it has been said that an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract.
>
> The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim.  A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds.  Nor does the rule alter the standards for deciding and reviewing motions for summary judgment.  The genuine issue rule in the context of bad faith claims allows a trial court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law.  On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably.  Thus, an insurer is entitled to summary judgment based on a genuine dispute over coverage or the value of the insured's claim only where the summary judgment record demonstrates the absence of triable issues as to whether the disputed position upon which the insurer denied the claim was reached reasonably and in good faith.

*Wilson*, 42 Cal. 4th at 723–24 (internal citations and quotations omitted).  In particular, where

language in an insurance policy is ambiguous, summary judgment is appropriately granted so

long as the insurer is reasonable in its interpretation of the policy language.  *See Amadeo v.*

*Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1162 (9th Cir. 2002); *cf. Lunsford v. Am. Guar. &*

*Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir. 1994) (concluding that summary judgment was

1  appropriate where a decision not to defend under an insurance policy was based on an

2  investigation of the claim and "a reasonable construction of the policy," despite a finding that the

3  policy was ambiguous as to coverage).

4      In this case, defendant argues that because it was reasonable for it to deny plaintiffs'

5  claims due to plaintiffs' counsel's conduct, it is entitled to summary judgment on plaintiffs' bad

6  faith claim.  (Doc. No. 102-1 at 27–29.)  The court does not find defendant's argument in this

7  regard to be supported by the evidence on summary judgment or persuasive.

8      In light of the evidence before it on summary judgment, the court finds a genuine dispute

9  as to whether defendant's denial of the claim for non-cooperation, and its reading of the Policy

10  language regarding cooperation, were indeed reasonable.  As stated above, it is undisputed that

11  plaintiffs cooperated by giving three recorded statements, answering hundreds of questions about

12  their financial affairs and personal property, sending defendant more than 1,100 pages of

13  documents, and delivering 888 pages of photographs, including pictures of items appearing on

14  their Inventory List.  (PUF ¶¶ 21, 56, 65; Doc. No. 103-2 at ¶ 12.)  In addition, it is undisputed

15  that plaintiff Singh attended his 2022 EUO, where he answered more questions about his family,

16  Property size, employment, the scope of the damage, repair estimates, and items in the garage.

17  (PUF ¶¶ 68–79.)  The 2022 EUO ended when defendant's counsel announced that there was a

18  "fundamental disagreement with [plaintiffs'] attorney as to what his involvement is" with the

19  EUO process.  (Doc. No. 102-2 at 83.)  It is undisputed that defendant did not proceed with

20  plaintiff Kumar's EUO, which was scheduled to begin later that same day, and has not asked to

21  proceed with it since.  (PUF ¶ 113.)  Defendant admits that after the 2022 EUO it "never

22  completed its investigation" and denied plaintiffs' claim.  (DUF ¶¶ 28, 29.)  Defendant also

23  admits that it has "paid no policy benefits towards repairing the loss property."  (PAUF ¶ 8.)

24      These facts create a genuine dispute as to whether defendant's interpretation of the Policy

25  and decision to deny plaintiffs' claim for noncooperation were reasonable, particularly in light of

26  its duty to investigate.  Viewed in the light most favorable to plaintiffs as the non-moving party, a

27  reasonable jury could conclude that defendant "unreasonably withheld policy benefits based on

28  an incomplete investigation, a refusal to evaluate the information that was made available, and a

1  refusal to offer partial payment." *Subrigo Int'l Corp. v. Sentinel Ins. Co*., No. 2:23-cv-03354-

2  JLS-SK, 2024 WL 4004982, at *5–6 (C.D. Cal. July 3, 2024) (denying the defendant's motion for

3  partial summary judgment as to the plaintiff's claim for breach of the implied covenant of good

4  faith and fair dealing); *see also Nissani*, 2022 WL 17222239, at *2 (denying the defendant's

5  motion for summary judgment on the plaintiff's claim for breach of the implied covenant of good

6  faith and fair dealing, noting that the evidence submitted on summary judgment showed that the

7  defendants denied coverage due to non-cooperation because the plaintiff refused to appear in

8  person in 2020 for an EUO due to the pandemic, and finding a genuine dispute of fact as to the

9  reasonableness of the defendant's position that an in-person EUO is required for cooperation).

10  Accordingly, defendant's motion for partial summary judgment as to plaintiffs' second

11  claim for "insurance bad faith" will also be denied.

12  3.  Plaintiffs' Punitive Damages Claim

13  Defendant next moves for summary judgment in its favor on plaintiffs' claim for punitive

14  damages, arguing that "if the Court dismisses Plaintiffs' bad faith claim, it should also dismiss

15  Plaintiffs' claim for punitive damages, as negligence does not give rise to punitive damages."

16  (Doc. No. 102-1 at 28.)  Because the court has determined that defendant is not entitled to

17  summary judgment in its favor on plaintiffs' bad faith claim, the court will also deny defendant's

18  motion for summary judgment as to plaintiffs' claim for punitive damages.  *See Abramyan v.

19  GEICO Ins. Co*., No. 2:16-cv-01069-MCE-AC, 2019 WL 93436, at *6 (E.D. Cal. Jan. 3, 2019)

20  ("GEICO's concurrent claim that punitive damages associated with Plaintiffs' tort claim for bad

21  faith be stricken also fails given the factual disputes presented by this matter, and the fact that the

22  jury must decide whether those disputed facts justify punitive damages.").

23  4.  Plaintiffs' Negligence Claims

24  Next, defendant moves for summary judgment in its favor on plaintiffs' third claim for

25  "negligent failure to obtain insurance coverage" and fourth claim for negligent misrepresentation.

26  (Doc. No. 102-1 at 29–31.)  Defendant argues that it is the insured's burden to obtain appropriate

27  coverage and that here there is "simply no evidence of an indispensable element – a

28  misrepresentation."  (*Id*.)  In opposition, plaintiffs explain that defendant treated the garage/rear

25

1   structure on the Property, which was a "large alternative living space and workshop behind the

2   family's small (two-bedroom, one bathroom) front structure," "as an 'other structure' under the

3   Policy, and applied a fractional policy limit."  (Doc. No. 106 at 24.)  Thus, even if defendant did

4   pay the claim, plaintiffs would be "short by hundreds of thousands of dollars."  (*Id.*)  Plaintiffs

5   argue that at trial they will prove that the garage falls within the main Coverage A limits of the

6   Policy.  (*Id.* at 25.)  As an alternative theory, they bring negligence claims for damages if the

7   garage is treated under the lower Coverage B limits.  (*Id.*)  In reply, defendant states that

8   plaintiffs' arguments "make no sense" and that there is no dispute that their sales agent explained

9   the Policy's limits to plaintiff Kumar and that plaintiff Kumar never contacted defendant to

10   increase the Coverage B limit or otherwise.  (Doc. No. 109 at 15.)

11        As to plaintiffs' third claim, "California recognizes the general rule that an agent or broker

12   who intentionally or negligently fails to procure insurance as requested by a client--either an

13   insured or an applicant for insurance--will be liable to the client in tort for the resulting damages."

14   *AMCO Ins. Co. v. All Sols. Ins. Agency, LLC*, 244 Cal. App. 4th 883, 890 (2016).  "To prove a

15   claim for negligent failure to obtain insurance coverage a plaintiff must prove:  (1) that plaintiff

16   requested the defendant to obtain insurance coverage and defendant promised to obtain that

17   insurance for them; (2) that the defendant was negligent in failing to obtain the promised

18   insurance; (3) that plaintiff was harmed; and (4) that the defendant's negligence was a substantial

19   factor in causing the harm."  *Morfin v. Allstate Prop. & Cas. Ins. Co*., No. 19-cv-00603-JVS-

20   KES, 2019 WL 7205994, at *4 (C.D. Cal. Dec. 9, 2019).  "As a general proposition, an insurance

21   agent does not have a duty to volunteer to an insured that the latter should procure additional or

22   different insurance coverage."  *Vulk v. State Farm Gen. Ins. Co*., 69 Cal. App. 5th 243, 254

23   (2021) (citation omitted).  "In the ordinary case, the onus is . . . squarely on the insured to inform

24   the agent of the insurance he requires."  *Id*.  "The general no-duty rule changes only when one of

25   the following three things occurs:  (1) the agent misrepresents the nature, extent or scope of the

26   coverage being offered or provided; (2) there is a request or inquiry by the insured for a particular

27   type or extent of coverage; or (3) the agent assumes an additional duty by either express

28   agreement or by holding themself out as having expertise in a given field of insurance being

sought by the insured." *Id.* "To trigger a special duty of care under the first scenario, there must

be an affirmative misrepresentation." *Id.* (citing *Sheahan v. State Farm General Ins. Co.* 442 F.

Supp. 3d 1178, 1187 (2020)).  Plaintiffs' fourth claim for negligent misrepresentation also

requires evidence of a misrepresentation.  *See Mill Creek Mgmt. & Real Est. Sales, Inc. v. United

States Liab. Ins. Co.*, No. 1:24-cv-00984-KES-BAM, 2025 WL 373154, at *2 n.1 (E.D. Cal. Feb.

3, 2025) ("The elements on a negligent misrepresentation are (1) the misrepresentation of a past

or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent

to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the

misrepresentation, and (5) resulting damage.").

   As stated above, defendant argues that there is no evidence before the court on summary

judgment that its representative made any misrepresentation to plaintiffs, as required for liability

on plaintiffs' negligent misrepresentation claim and for liability on plaintiffs' negligent failure to

obtain coverage claim through the first exception to the no-duty rule.  (Doc. No. 102-1 at 29–31.)

Plaintiffs argue that defendant made two misrepresentations:  (1) that it would provide coverage

sufficient to cover the whole Property, and (2) that the rear structure, together with the front

structure, was part of a single insured home, subject to the Coverage A limit.  (Doc. No. 106 at

25.)  As evidence in support of their misrepresentation claim, plaintiffs point to the transcript of

the phone call in 2018 between plaintiff Kumar and defendant's sales employee, Mark Raysor,

when plaintiff Kumar called to open a live policy after submitting a request for an online quote.

(Doc. No. 106-2 at 20–62.)  Plaintiffs argue that in this conversation, Mr. Raysor's comments

about what it "would cost to rebuild your home in an emergency" and that "Nationwide is going

to protect, you know, your biggest asset, you are purchasing your – the house" constitute

assertions that he would provide insurance coverage sufficient to rebuild the Property in full, and

not just the front structure.  (Doc. No. 106 at 25.)  Further, plaintiffs argue that Mr. Raysor's

comments about the existence of "two bathrooms," when the front structure and rear structure

each had one bathroom, and the "partial concrete slab" foundation, when the front structure had a

crawl space foundation, and the rear structure was on a concrete slab, demonstrate that for

purposes of insurance coverage he was lumping the structures together as one single dwelling and

that those comments amount to a misrepresentation that the rear structure would be combined

with the front structure as part of a single insured home subject to the higher Coverage A limits.

(*Id*.)  They also argue that Mr. Raysor's increase of the Coverage A limit due to the existence of a

wooden deck on the Property was confirmation that he would treat the rear structure as part of the

dwelling.  (*Id*. at 26.)  The misrepresentations alleged by plaintiff in the reproduced conversation

between Mr. Raysor and plaintiff Kumar are emphasized below:

> Q.  Well, now I am going to review this estimate that it did with you online.  *What it looks like it would cost to rebuild your home in an emergency.*  I am going to confirm it here, and when you are ready to move forward, we'll go over it in a little bit more detail here, so, I am getting this to load up next here.  Have any remodel – renovations or remodeling been done to the property?
>
> A.  Yes.
>
> Q.  What type of renovations or remodeling have been done?
>
> A.  It is fully remodeled.
>
> Q.  Fully remodeled, okay.  That's nice.
>
> A.  Mm-hmm.
>
> Q.  Good deal.  There we go.  Okay.  So it tells me how big the house is.  It is 844 square feet; would that be right?
>
> A.  Yeah. I don't – I thought it was 900.  Is that what it is coming up as?
>
> […]
>
> Q.  Okay.  Foundation for the house, it says – well, it says it is a concrete slab, but I don't know.  I mean, so that year of house, it is probably different, like a crawl space, I mean –
>
> A.  Is it – the house has a crawl space, the garage is on a concrete slab.
>
> Q.  *Partial concrete slab*, okay.  But most of the house is a crawl space, then, you think, for most of the construction –
>
> A.  That garage is detached from the house, so –
>
> Q.  Oh, okay.
>
> A.  The garage is on a concrete slab, and the house is on a raised foundation.

/////

28

Q.  Okay.  So, yeah, the house, then, is, yeah, crawl space.  Okay.  Got it.  Okay.  Not a problem.  Good deal.  Okay.  And the number of bathrooms in the house.  It was listed here, what did it do here, it's just one.

A.  There's one in the house and one in the garage.

Q.  So there's *two bathrooms* then?

A.  Yes.

Q.  Oh, okay.  All right.  Okay.  So I have got *two bathrooms* on here then, okay.

[…]

Q.  Okay.  So this is going to calculate here, you know, *we added one bathroom*, it didn't have that; and we also, you know, needed to make it correct to the crawl space instead of concrete slab foundation, here.  Let's see.  Oh.  Well, actually I guess it is cheaper for crawl space versus concrete slab, so it actually brought it down a little bit from 246 to 236,144.  Brought it down a little bit on the reconstruction, so –

A.  Okay.

Q.  – for the policy purposes, it is going to round off to dwelling coverage will be 236,100 for you to cover the house.

A.  Okay.

Q.  Other structures will be at 23,610.

A.  Mm-hmm.

Q.  So we're going to let those main ones update.  What we are doing now, we are at the point where we are going to discuss the coverages and how *Nationwide is going to protect*, you know, your biggest asset, you are purchasing your – the house, and so that's the main part.  Personal property.  172,550.

A.  Mm-hmm.

[…]

Q.  All right.  Since you are, you know, *providing the adequate protection*, we are going to gather some additional information specific to the home.  Basically we are just going to review that reconstruction.  We need a little bit more detail.

A.  Mm-hmm.

Q.  Now, so first thing we want to confirm with you, is the house a single-family home?

1     A.  Yes.

2     Q.  Okay.  And, again, we have it as year built as 2018 – I mean,
      excuse me, 1918.  I have the style as one-story house that has a crawl
3     space foundation.  And total living square foot area, we put it as 900
      square feet.

4
      A.  Mm-hmm.
5
      Q.  *Two bathrooms*, one kitchen area.
6
      A.  Mm-hmm.
7
      Q.  They do have the house with central heat.
8
      A.  Mm-hmm.
9
      Q.  Any attached structures, such as breezeways or wood decks or
10    anything like that?

11    A.  There is a – a deck, I guess it's –

12    Q.  Okay.

13    A.  It is – yeah, it—it is considered a deck.

14    Q.  There is a deck on the house, okay.

15    A.  Not – not on the house.  It is in between the house and the – it is
      not attached to the house.
16
      Q.  Oh, so *it is a detached structure*, oh, okay.  Okay.  Got it.  So let's
17    see.  I probably just need to list that here.  Let's see.  No, that
      wouldn't be it.  Now – wait.  Yeah, yeah, I will have to put it here.
18    So anyways, you know, it is covered, I mean, it is covered as a
      detached structure anyway.  Yeah.  No, I guess I wouldn't add it here.
19
      A.  Okay.
20
      Q.  Well, no, I guess I do need to add it here actually, yeah, I do.
21    That's – yes, is it like a 10 by 10 or 20 by 20 or –

22    A.  Yeah, that –

23    Q.  Is it kind of small?

24    A.  – sounds right.

25    Q.  Kind of small, okay.

26    A. It is a small one, yeah.

27    Q.  Okay.

28    […]

                                    30

Q. Okay.  Good enough.  Good enough.  Okay.  Okay.  *So I took it to a little bit more because the wood deck now, 239,900, to get it rebuilt with everything.*  And *it is your main dwelling coverage to rebuild the house*, so for coverages that we are going to go over, you will be responsible for paying the out-of-pocket deductible you choose and any damage amounts for a covered claim above the coverage limits that you selected.  So 239,900 for your dwelling coverage.  Other structures on the property, we'll have it at 23,990.

A.  Mm-hmm.

(Doc. No. 106-2 at 26–40) (emphasis added).  Finally, as further support for their claim of negligent misrepresentation, plaintiffs point to defendant's underwriting materials which report plaintiffs' home as having two bathrooms.  (Doc. No. 102-3 at 177.)  Plaintiffs argue that this phone call and underwriting evidence together demonstrate that defendant "considered the two structures to be combined" and that Mr. Raysor promised them that "the insurance would provide full coverage for the property in case of emergency."  (Doc. No. 106 at 26.)

On summary judgment the court has reviewed the underwriting materials and the transcript of the call between plaintiff Kumar and Mr. Raysor in full and finds that plaintiffs have not raised a genuine dispute as to the existence of a misrepresentation.  In the call, Mr. Raysor asks dozens of questions about plaintiffs and the Property.  Contrary to plaintiffs' argument, Mr. Raysor did not make any arguable misrepresentation regarding the Policy's coverage to plaintiff Kumar and instead merely made general statements as he collected additional information to develop the Policy, telling plaintiff Kumar that they are going to review the online estimate of "what it looks like it would cost to rebuild your home in an emergency," that "Nationwide is going to protect . . . the house," and that he just needs "some additional information specific to the home" in order to "provid[e] the adequate protection."  (Doc. No. 106-2 at 26–40.)  None of these vague statements amount to any misrepresentation about the scope of coverage the Policy that defendant ultimately offered plaintiffs would provide.

Also contrary to plaintiffs' argument, Mr. Raysor never represented that the rear structure would be subject to the higher Coverage A limit or would be considered together with the front structure in determining whether the Coverage A or Coverage B limit applied to it.  When Mr. Raysor asked about the "foundation for the house," he initially revealed he understood that the

foundation was a "partial concrete slab," which plaintiffs now argue is evidence that he lumped the front and rear structures together. (Doc. No. 106-2 at 28.) However, when plaintiff Kumar explained that "[t]he garage is on a concrete slab," Mr. Raysor then immediately clarified that, because the front and rear structures were not connected, the house foundation has a "crawl space," and the underwriting materials indicate that the "foundation type" was marked as "crawl space," and not "concrete slab or "partial concrete slab." (Doc. No. 102-3 at 177.) Thus, Mr. Raysor's initial misunderstanding regarding the foundation, which was quickly corrected, is not evidence of any misrepresentation on his part either.

As noted above, plaintiff argues that the phone conversation and underwriting materials evidence a misrepresentation because they suggest that the Property had two bathrooms, which is only possible if the front and rear structures are considered together as constituting one home. The court disagrees. In the phone conversation, plaintiff Kumar clarified that the Property had one bathroom "in the house" and one bathroom "in the garage." (Doc. No. 106-2 at 29.) The underwriting materials then confirm that the Property contains two bathrooms and one detached garage. (Doc. No. 102-3 at 177.) These materials do not reflect what plaintiffs seemingly suggest that they do—namely, that defendant treated the Property as containing two bathrooms but no detached garage and instead as one singular structure. Thus, the court rejects plaintiffs' argument that Mr. Raysor's conclusion that the Property had two bathrooms and one detached garage lends support to the existence of a misrepresentation that the two structures would be considered together and covered under the Coverage A limit.

Finally, the court finds plaintiffs' contention that Mr. Raysor's increase of the Policy limits due to the existence of a wooden deck is evidence of a misrepresentation that the front and rear structures would be considered together to also be unpersuasive. It is the case that Mr. Raysor increased the Coverage A limit to $239,900 after learning that the Property had a wooden deck, which is a detached structure, and detached structures are listed in the Policy as covered under Coverage B. But as is also clear from the Policy, Coverage B limits "reflect an amount based on 10% of your Coverage A – Dwelling limit." (Doc. No. 105-1 at 526.) In advancing their argument on this point, plaintiffs conveniently ignore the very next sentence spoken by Mr.

1  Raysor in discussing the wooden deck, where he states that $239,900 is the new dwelling

2  coverage, and $23,990 is the new "other structures on the property" coverage.  (Doc. No. 106-2 at

3  43.)  Clearly, after learning of the detached wooden deck through his conversation with plaintiff

4  Kumar, Mr. Raysor increased the Coverage A and Coverage B limits, which are a function of

5  each other.  Thus, contrary to plaintiffs' argument, these increases due to the presence of a

6  detached structure deck provide no evidence that defendant lumped structures together or

7  purported that it would treat several structures on the Property under Coverage A.  Rather, the

8  Coverage A and Coverage B amounts are simply dependent upon each other under the Policy.

9       In the absence of any evidence of a misrepresentation, defendant is entitled to summary

10  judgment in its favor on both of plaintiffs' negligence claims.[8]

11

---

12  [8]  In their opposition, plaintiffs do not argue that their claim for negligent failure to procure
    insurance can be maintained without evidence of a misrepresentation that excepts defendant from
13  the general "no-duty rule."  However, the court notes that even if plaintiffs intended to pursue this
    claim without an exception to the "no-duty rule," there is no evidence before the court on
14  summary judgment that there was any request for insurance coverage from plaintiffs that
    defendant promised but failed to obtain, as required for a claim of negligent failure to obtain
15  insurance coverage.  As defendant points out, nowhere does plaintiff Kumar say "I want enough
    insurance to fully rebuild my garage if it is destroyed, regardless of policy limits."  (Doc. No. 109
16  at 18.)  Further, the Policy itself clearly instructs plaintiffs to "[p]lease review the Coverage B –
    Other Structures limit on your declarations to ensure you continue to be comfortable with your
17  coverage amount.  Examples of 'other structures' include, but are not limited to, detached
    garages, tool sheds, driveways, swimming pools, gazebos, and fences.  Unless you purchased
18  increased limits for Coverage B, this coverage may reflect an amount based on 10% of your
    Coverage A – Dwelling limit."  (Doc. No. 105-1 at 526.)  There is no evidence before the court
19  on summary judgment that plaintiffs reviewed the Policy and then inquired as to the amount of
    coverage for their detached garage and requested increased coverage, which was then promised.
20  In fact, the evidence before the court on summary judgment suggests the opposite.  *See* DUF ¶ 21
    (wherein it is undisputed that "Ms. Kumar and Mr. Singh never contacted Nationwide to increase
21  the Coverage B limit").  Accordingly, the court finds that even if plaintiffs had argued that their
    negligent failure to procure insurance claim does not require evidence of a misrepresentation,
22  defendant would still be entitled to summary judgment on this claim.  *See Morfin*, 2019 WL
    7205994, at *4 (granting the defendant's motion for summary judgment in its favor on the
23  plaintiff's negligent failure to obtain insurance coverage claim, finding that "Allstate's undisputed
    evidence shows that Morfin did not request that Allstate or [the Allstate agent] obtain increased
24  insurance coverage or that [the Allstate agent] represented that he would do so"); *cf. MV Transp.,
    Inc. v. Omne Staff Leasing, Inc.*, 378 F. Supp. 2d 1200, 1208 (E.D. Cal. 2005) (denying the
25  defendant's motion for summary judgment as to the plaintiff's negligent procurement of
    insurance claim because the parties "provided directly conflicting evidence" as to whether the
26  defendant was asked to obtain insurance).

27

28

1    **B.**     **Plaintiffs' Motions for Partial Summary Judgment**

2          Plaintiff Singh moves for partial summary judgment in his favor as to defendant's three

3    non-cooperation affirmative defenses and one fraud-related affirmative defense.  (Doc. No. 104-1

4    at 20–29.)[9]  Plaintiff Kumar joins plaintiff Singh's motion[10] and also moves for partial summary

5    judgment in her favor on defendant's three non-cooperation affirmative defenses on the separate

6    basis that she is "an innocent co-insured."  (Doc. No. 103-1 at 5.)

7          1.     Non-Cooperation Affirmative Defenses

8          Defendant asserts thirty-seven affirmative defenses in its answer, with three relating to

9    plaintiffs' failure to cooperate:  plaintiffs' failure to comply with Policy terms (affirmative

10   defense 19), plaintiffs' failure to cooperate (affirmative defense 22), and plaintiffs' failure to

11   provide documents and an examination under oath (affirmative defense 23).  (Doc. No. 16 at 14–

12   15.)  Plaintiffs argue that each of these three affirmative defenses depend on plaintiff Singh's

13   alleged failure to comply with the cooperation and EUO requirements of the Policy, and that

14   defendant lacks evidence of any such breach or resulting prejudice.  (Doc. No. 104-1 at 20.)

15   _____

16   [9]  In addition, plaintiff Singh argues that he is "entitled to partial summary judgment as to
     Nationwide's violation of his rights under the Policy and Insurance Code § 2071.1(a)(4)."  (Doc.
17   No. 104-1 at 18.)  This insurance code states that at an EUO, "[t]he insured may be represented
     by counsel and may record the examination proceedings in their entirety."  Cal. Ins. Code
18   § 2071.1(a)(4).  Plaintiff Singh argues that "California law is now settled" that he "had the right
     under Insurance Code § 2071.1(a)(4) to videotape the proceedings."  (Doc. No. 104-1 at 19.)  He
19   argues that "as a matter of law, therefore, Nationwide violated the law and the Policy."  (*Id.*)
     However, plaintiffs do not bring a claim in this action related to an alleged violation of their
20   rights under California Insurance Code § 2071.1(a)(4) to videotape the proceedings.  Further,
     plaintiff Singh does not direct the court to any claim or affirmative defense in which he seeks
21   summary judgment on this basis.  In its opposition, defendant argues that "the video recording
     issue is irrelevant" and "simply has nothing to do with this case" because the "operative denial
22   was based on entirely different issues than whether Plaintiffs could video record anything or
     anyone at an EUO."  (Doc. No. 107 at 5–7.)  In plaintiffs' joint reply, they argue that "Nationwide
23   serially violated their rights under Insurance Code § 2071.1(a)(4)" and that they have established
     such violations as a matter of law.  (Doc. No. 108 at 6–7.)  Nonetheless, plaintiffs still do not link
24   this argument to any claim or affirmative defense pursued in this action, and the court cannot
     identify one.  The court will therefore deny plaintiff Singh's motion for partial summary
25   judgment to the extent it is based on his arguments regarding videotaping under §2071.1(a)(4).
     To the extent that plaintiff Kumar joins in this aspect of plaintiff Singh's motion (Doc. No. 103-1
26   at 4), partial summary judgment in her favor on this basis will be denied as well.
27
28   [10]  The court notes that the plaintiffs in this case are represented by the same counsel.

1    Plaintiff Kumar separately argues that defendant cannot maintain these affirmative defenses as to

2    her because she cannot be held responsible for plaintiff Singh's actions.  (Doc. No. 104-1 at 20.)

3    The court will first address the basis for summary judgment advanced by both plaintiffs and then

4    take up plaintiff Kumar's separate basis upon which summary judgment is sought.

5                      a.     *Evidence of Breach and Prejudice*

6           Plaintiffs first argue that defendant lacks evidence of a Policy breach and of substantial

7    prejudice to support its non-cooperation affirmative defenses.  (Doc. No. 104-1 at 20.)  In

8    opposition, defendant argues that there is abundant evidence that plaintiffs breached the Policy's

9    cooperation and EUO conditions in prejudicial ways.  (Doc. No. 107 at 7–9.)

10          "In order to prevail on a cooperation clause defense," defendant "must show breach and

11   substantial prejudice." *Silicon Storage Tech., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No.

12   13-cv-05658-LHK, 2015 WL 7293767, at *4 (N.D. Cal. Nov. 19, 2015) (citing *Truck Ins. Exch.*

13   *v. Unigard Ins. Co.*, 79 Cal. App. 4th 966, 975 (2000)).  For substantial prejudice, defendant must

14   show "that if the cooperation clause had not been breached there was a substantial likelihood the

15   trier of fact would have found in the insured's favor." *Silicon Storage Tech., Inc.*, 2015 WL

16   7293767, at *4 (citing *Belz*, 158 Cal. App. 4th at 630).  Importantly, "the issue of prejudice is

17   ordinarily one of fact." *Silicon Storage Tech., Inc.*, 2015 WL 7293767, at *4 (citing *Nw. Title*

18   *Sec. Co. v. Flack*, 6 Cal. App. 3d 134, 141 (1970)).

19          In determining above that defendant is not entitled to summary judgment based upon

20   plaintiffs' claimed non-cooperation, the court has already found that there are disputed issues of

21   material fact as to both breach and prejudice.  The court determined that there is evidence before

22   the court on summary judgment that plaintiffs did not provide a phone number for Mr. Timoti, a

23   witness with potential knowledge regarding the purportedly damaged or destroyed toolboxes, and

24   evidence that plaintiffs' counsel interjected during the 2022 EUO.  Evidence has also been

25   presented that plaintiffs' actions may have prejudiced defendant's investigation of their claim,

26   since defendant's investigator attempted to corroborate plaintiffs' ownership of the Snap-On

27   brand toolsets in other ways, for example by seeking out local Snap-On dealers, but was

28   unsuccessful, thus potentially necessitating contact with Mr. Timoti.  (Doc. No. 102-3 at 79–86.)

1    However, as discussed above, defendant had not demonstrated that plaintiffs breached the Policy

2    and that defendant was prejudiced as a matter of law, in light of the evidence that plaintiffs did

3    cooperate with defendant's investigation by producing documents, giving recorded statements,

4    attending walk-throughs of the Property, and attending the 2022 EUO, which provided defendant

5    with other evidence upon which they could evaluate plaintiffs' claim.

6         Based on the same evidence before it on summary judgment, the court similarly finds that

7    plaintiffs have failed to demonstrate the absence of a genuine dispute that they indeed cooperated

8    as required by the Policy.  In this regard, plaintiffs' failure to provide contact information for

9    witnesses or uninterrupted answers to certain questions posed at the EUO could be found to

10   amount to prejudicial non-cooperation if, for example, it prevented the insurer "from determining

11   whether there was coverage for the loss."  *Gilbert v. Infinity Ins. Co*., 186 F. Supp. 3d 1075, 1082,

12   1086–87 (C.D. Cal. 2016) (finding that "the particular facts of this case," wherein the plaintiff

13   claimed that his truck sank in quicksand but there was "no evidence of any quicksand or

14   sinkholes at the location where [the p]laintiff's truck was allegedly damaged," supported the

15   granting of summary judgment for the defendant based upon prejudicial non-cooperation where

16   the plaintiff "never provided [the d]efendant with [] unredacted cellphone records" meaning that

17   the defendant "could not confirm" several details of the plaintiff's account); *see also Ram*, 807 F.

18   Supp. 2d at 857 (noting that "an insured breaches the duty to cooperate where she sits for an EUO

19   but refuses to produce sufficient records" or fails "to answer material questions").  Here, the

20   finder of fact must determine whether plaintiffs' actions rise to a breach of the Policy and whether

21   defendant was able to proceed with the claim or was prejudiced by the inability "to thoroughly

22   investigate the claim and determine its proper course of action."  *Ram*, 807 F. Supp. 2d at 857.

23   Accordingly, plaintiffs' motion for summary judgment in its favor on defendant's three non-

24   cooperation affirmative defenses on the grounds that defendant has failed to present evidence of a

25   Policy breach or of prejudice will be denied.

26         b.    *The Innocent Co-Insured*

27         Plaintiff Kumar separately moves for partial summary judgment in her favor on

28   defendant's same non-cooperation affirmative defenses on the grounds that she is "an innocent

co-insured." (Doc. No. 103-1 at 5.)  Plaintiff Kumar argues that the Policy's language, which

relieves defendant "of its coverage duty *generally* as to all insureds if *any* insured fails to

perform," is precluded by California law.  (Doc. No. 103-1 at 5–6) (emphasis in original).  In

advancing this argument plaintiff Kumar relies on a decision of the California Supreme Court

holding that an insurance policy's "intentional acts exclusion" provision, which barred coverage

for property losses sustained by guilty insureds and innocent co-insureds, was invalid.  *Century-*

*Nat'l Ins. Co. v. Garcia*, 51 Cal. 4th 564, 573 (2011).  In opposition, defendant argues that the

Policy "complies with the rule announced in [*Garcia*]," and that plaintiff Kumar offers no

authority that a cooperation condition, rather than an exclusion provision, cannot be applied

jointly to both insureds.  (Doc. No. 107 at 14.)  In reply, plaintiff Kumar observes that the

undersigned applied the *Garcia* rule previously in *Praetorian Ins. Co. v. W. Milling, LLC*, No.

1:15-cv-00557-DAD-EPG, 2017 WL 4284717 (E.D. Cal. Sept. 27, 2017), which she argues

"weighs in favor of [her] position here."  (Doc. No. 108 at 18.)

   In *Garcia*, the Garcia family had "suffered substantial damage to their home when their

adult son set fire to his bedroom."  *Garcia*, 51 Cal. 4th at 566.  Jesus Garcia, his wife Theodora

Garcia, and their son were insured by their homeowner policy.  That policy stated "Century-

National does 'not cover loss caused directly or indirectly by any of the following excluded

perils, whether occurring alone or in any sequence, or concurrently, with a covered peril:  . . .

9. Intentional Loss, meaning any loss arising out of any act committed by or at the direction of

*any* insured having the intent to cause a loss.  10. Dishonesty, Fraud or Criminal Conduct of *any*

insured.'"  *Id*. at 567.  The court noted, however, "[i]n California, fire insurance policies are

regulated by the Insurance Code."  *Id*.  Section 2070 provides:

    All fire polices . . . shall be on the standard form, and, except as
    provided by this article shall not contain additions thereto.  No part
    of the standard form shall be omitted therefrom except that any
    policy providing coverage against the peril of fire only, or in
    combination with coverage against other perils, need not comply
    with the provisions of the standard form of fire insurance
    policy . . .; *provided, that coverage with respect to the peril of fire,*
    *when viewed in its entirety, is substantially equivalent to or more*
    *favorable to the insured than that contained in such standard form*
    *fire insurance policy.*

1    Cal. Ins. Code § 2070 (emphasis added.)  "Provisions of the standard form fire policy are set forth

2    in section 2071.  Thus, a policy that does not conform to section 2071's standard provisions must

3    provide total fire coverage that is at least 'substantially equivalent' to coverage provided by the

4    standard form."  *Garcia*, 51 Cal. 4th at 567.  The California Supreme Court examined the

5    statutory standard form and found that it contained "no express exclusion for losses caused by

6    intentional acts."  *Id*. at 568.  However, the court observed that California Insurance Code § 533

7    provides that "[a]n insurer is not liable for a loss caused by the willful act of *the* insured," not

8    "'an' insured or 'any' insured."  *Id*. (citing Cal. Ins. Code § 533 (emphasis added)).  The court

9    found that "[g]iven the settled meaning of the language used in section 533, the standard form fire

10   policy must be construed as including a willful acts exclusion that is protective of innocent

11   insureds."  *Garcia*, 51 Cal. 4th at 569.  Accordingly, the court concluded that "[a]s to innocent

12   insureds, application of the intentional acts exclusion in the Century-National policy results in

13   coverage that is not at least substantially equivalent to the level of protection provided in the

14   statutory standard form fire policy," and "the exclusion is to that extent invalid.  *Id*. at 573.

15         Plaintiff Kumar argues that *Garcia* established a rule that "carriers are barred from jointly

16   applying exclusionary policy provisions . . . to innocent co-insureds," and that this rule "logically

17   applies as well to denials based on breach of the non-cooperation and EUO Policy conditions

18   precedent to coverage."  (Doc. No. 103-1 at 7.)  Applying the *Garcia* rule here, plaintiff Kumar

19   argues that she is entitled to summary judgment in her favor on defendant's non-cooperation

20   affirmative defenses because its denial was "based entirely on the conduct of her husband" and

21   defendant "never tried to take her EUO."  (*Id*. at 5.)  Defendant points out in opposition that

22   Insurance Code § 2071 "contains no such language" that a "cooperation condition is improperly

23   applied to bar a claim entirely if only one of multiple insureds fails to cooperate," and adding

24   such a rule "would be a significant extension of California law."  (Doc. No. 107 at 15.)

25         The statutory standard form provided in Insurance Code § 2071 does not contain a

26   standard provision regarding cooperation or compliance with an insurance investigation.  Further,

27   plaintiff Kumar points to no authority suggesting that the standard form must be construed as

28   including a cooperation provision that is protective of innocent co-insureds.  Given the silence on

this issue, the court cannot conclude that the Policy, which states that defendant has "no duty to provide coverage . . . *if you or an 'insured'* seeking coverage fails to comply" with the cooperation duties, results in coverage that is not at least substantially equivalent to the level of protection provided in the statutory standard form fire policy.  (DUF ¶ 1.)

Further, while the undersigned did apply the *Garcia* rule in *Praetorian Insurance Co*., it did so to an actual exclusion provision, not a cooperation condition as is at issue here, where the policy language itself applied the exclusion to "the insured" and not "any" or "all" insureds. *Praetorian Insurance Co*., 2017 WL 4284717, at *3.  And although plaintiff Kumar argues that the result in *Garcia*, which protected an innocent insured from the intentional acts of their co-insured, should apply to conditions precedent to coverage as well, defendant has identified reasonable scenarios in which such application would not be logical.  *See, e.g.* Doc. No. 107 at 15–16 (arguing that under plaintiff Kumar's rule, "an insured who had all relevant information about the cause and extent of a loss could simply ignore an insurer's requests for even the simplest information about the claim, and a co-insured could still demand payment for the loss despite the insurer's investigation being made impossible").  In light of the lack of support for plaintiff Kumar's contention that the Policy violates the holding of the California Supreme Court in *Garcia*, plaintiff Kumar's separate motion for summary judgment in her favor on defendant's three non-cooperation affirmative defenses will be denied.

2.    Fraud Affirmative Defense

Finally, plaintiffs move for partial summary judgment in their favor as to defendant's twenty-fourth affirmative defense based on alleged fraud by plaintiffs.  (Doc. No. 104-1 at 28.) Plaintiffs argue that because defendant "did not deny the claim based on any alleged fraud . . . Nationwide has waived and is equitably estopped from asserting its fraud defense here." (*Id*.)  In opposition, defendant argues that "it never actually completed its fraud investigation because of Plaintiffs' and their counsel's non-cooperation and interference."  (Doc. No. 107 at 9.) Defendant also argues that the Policy allows for denial of a claim for fraudulent conduct, and there is evidence that plaintiffs acted fraudulently with regard to the purportedly damaged or destroyed toolboxes and their refusal to provide contact information for Mr. Timoti.  (*Id*.)  In

1    reply, plaintiffs note that they never suggested that defendant lacked "sufficient evidence to

2    survive summary judgment on its fraud defense." (Doc. No. 108 at 17.)  Rather, plaintiffs state

3    that they only argue that the court "should bar assertion of Nationwide's fraud defense on

4    equitable grounds," and defendant's lack of response on this point suggests that it has no

5    opposition. (*Id.*)

6         "In the insurance context, 'California courts have applied the general rule that waiver

7    requires the insurer to intentionally relinquish its right to deny coverage and that a denial of

8    coverage on one ground does not, absent clear and convincing evidence to suggest otherwise,

9    impliedly waive grounds not stated in the denial.'" *Potovsky v. Lincoln Benefit Life*, No. 23-cv-

10   02235-WHO, 2023 WL 8461171, at *7 (N.D. Cal. Dec. 6, 2023) (quoting *Waller v. Truck Ins.*

11   *Exch., Inc.*, 11 Cal. 4th 1, 31–32 (1995), *as modified on denial of reh'g* (Oct. 26, 1995)), *aff'd sub*

12   *nom. Potovsky v. Lincoln Benefit Life Co.*, No. 23-4130, 2024 WL 5289187 (9th Cir. Jan. 7,

13   2025).[11]  "More specifically, '[a]n intention to waive a . . . [provision of a contract] is not evinced

14   by the failure to raise that point in a letter denying a claim.'" *Id.*  However, "[t]he Ninth Circuit

15   has held that an insurer waives defenses to coverage not asserted in its denial if the insured can

16   show misconduct by the insurer or detrimental reliance by the insured." *Potovsky*, 2023 WL

17   8461171, at *7 (citing *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1559 (9th Cir.

18   1991)); *see also Waller*, 11 Cal. 4th at 33–34 (noting that California courts will find waiver where

19   "the insurer's acts are so inconsistent with an intent to enforce the right as to induce a reasonable

20   belief that such right has been relinquished").  "The burden 'is on the party claiming a waiver of a

21   right to prove it by clear and convincing evidence that does not leave the matter to

22   speculation[;] . . . doubtful cases will be decided against a waiver.'" *Dietz Int'l Pub. Adjusters of*

23   *California, Inc. v. Evanston Ins. Co.*, 796 F. Supp. 2d 1197, 1209 (C.D. Cal. 2011) (quoting

24   *Waller*, 11 Cal. 4th at 31), *aff'd*, 515 F. App'x 680 (9th Cir. 2013).

25        Plaintiffs agree that defendant is not barred from pursuing a fraud affirmative defense

26   simply because it did not raise fraud in its coverage denial, but they nonetheless argue that

27

28   _____

[11]  Citation to unpublished Ninth Circuit opinions throughout this order is appropriate pursuant to
Ninth Circuit Rule 36-3(b).

defendant's misconduct and plaintiffs' detrimental reliance are "easily demonstrated."  (Doc. No.
104-1 at 28–29.)  As examples of such misconduct, plaintiffs reference defendant's "pretextual
fraud and arson investigation," its "threat[] to deny the claim in September 2020 based on what it
now admits was a bogus non-cooperation accusation," its "serial[] lie[s] to state agencies
regarding alleged non-cooperation by the insureds," its serial[] violat[ions of] its insureds' rights
in the conduct of the EUOs in February 2021 and June 2022," its "deni[al of] the claim based on
its insureds' insistence that they be permitted to exercise their rights afforded by California
statute," and its denial of the claim due to "imagined interference by its customers' lawyer."  (*Id*.)
As for detrimental reliance, plaintiffs argue that following defendant's insistence that plaintiffs
"sit for EUOs, the insureds have incurred fees and litigation costs running into the tens of
thousands of dollars and which could run to hundreds of thousands."  (*Id*. at 29.)

The court observes that in their briefing, plaintiffs did not cite a single fact or piece of
evidence submitted to the court on summary judgment in support of any of their purported
examples of defendant's misconduct.  The court has reviewed plaintiffs' statement of undisputed
facts in search of factual support and finds that facts proffered by plaintiffs that could support
these alleged instances of misconduct are indeed clearly disputed by defendant.  (*See* PUF ¶¶ 12,
15, 39, 47, 57, 104, 107, 108, 111.)

Further, while plaintiffs did identify evidence of their litigation costs, (Doc. No. 105-2 at
¶ 31), the court is not at all convinced that these fees support their claim of detrimental reliance
for the purpose of a waiver analysis.  Courts have generally found an insured's detrimental
reliance, and consequently, the insurer's waiver, where the insurer falsely suggests to the insured
that there is no coverage dispute between them.  *See Intel Corp.*, 952 F.2d at 1559 (citing *Miller
v. Elite Ins. Co*., 100 Cal. App. 3d 739, 754 (1980) (finding waiver where the insurer "in
proceeding to deal with [the other party's insurer] as though [the insurer] intended to represent
and defend [the insured], creat[ed] the impression that there was no coverage dispute")); *Dalzell
v. Northwestern Mut. Ins. Co*., 218 Cal. App. 2d 96, 102 (1963) (finding waiver where the insurer
told the insured that "everything would be taken care of")); *see also Stinson v. Home Ins. Co*., 690
F. Supp. 882, 885 (N.D. Cal. 1988) ("[T]he cases in which courts have found that carriers have

41

waived these limitations involve situations where the carrier engaged in affirmative acts—such as promising to pay the claim . . . .").  Here, plaintiffs have identified no evidence that defendant suggested to them that there would be no coverage dispute, only to belatedly raise a fraud affirmative defense after inducing plaintiffs' reliance on its earlier assurance.  Without evidence of this nature, plaintiffs' litigation costs in pursuing this action fail to represent clear and convincing evidence of plaintiffs' detrimental reliance on anything.

Accordingly, the court will deny plaintiffs' motion for summary judgment in its favor on defendant's fraud affirmative defense, finding that plaintiffs have not come forward with clear and convincing evidence of defendant's misconduct or of their own detrimental reliance as required to be entitled to a finding that this defense was waived.  *See Garnicas Transp., LLC v. Com. All. Ins. Co.*, No. 1:21-cv-01018-SKO, 2023 WL 5274704, at *9 (E.D. Cal. Aug. 16, 2023) (finding no waiver where there was "no evidence, much less clear and convincing evidence, that [the defendant] engaged in any misconduct or acted in a manner . . . to induce a reasonable belief that such right has been relinquished") (internal citation and quotation omitted).

## CONCLUSION

For the reasons explained above,

1.    Defendant's motion for summary judgment (Doc. No. 102) is GRANTED IN PART and DENIED IN PART;

      a.    Defendant's motion for summary judgment in its favor on plaintiffs' negligent failure to obtain insurance coverage and negligent misrepresentation claims is GRANTED;

      b.    Defendant's motion for summary judgment in its favor on plaintiffs' failure to cooperate and plaintiffs' breach of the covenant of good faith and fair dealing and punitive damages claims is DENIED;

2.    Plaintiff Kumar's motion for partial summary judgment (Doc. No. 103) is DENIED;

3.    Plaintiff Singh's motion for partial summary judgment (Doc. No. 104) is DENIED;

4.      This case proceeds on plaintiffs' breach of contract and breach of the covenant of
good faith and fair dealing claims; and

5.      The parties are directed to meet and confer on their availability for trial, and within
fourteen (14) days of the entry of this order, to contact Courtroom Deputy Pete
Buzo at (916) 930-4016 or pbuzo@caed.uscourts.gov with their multiple proposed
dates for a Final Pretrial Conference and Jury Trial in this action.  Upon receipt of
the parties' proposals the court will issue an order rescheduling those dates.

IT IS SO ORDERED.

Dated:    **March 18, 2025**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE